1
2
3
4
5
6
7                    **IN THE UNITED STATES DISTRICT COURT**
                       **FOR THE DISTRICT OF ARIZONA**
8
9    **UNITED STATES OF AMERICA,**      )      **No. CR 09-1230-TUC-CKJ (CRP)**
                                        )
10                                      )
                                        )      **AMENDED REPORT**
11              **Plaintiff,**          )      **AND RECOMMENDATION**[1]
                                        )
12   **vs.**                            )
                                        )
13                                      )
     **MICHAEL EDWARD MILLIGAN,**       )
14                                      )
                                        )
15            **Defendant.**            )
     _____   )
16

17          Pending before the Court are Defendant Milligan's Motion to Suppress Evidence

18   (Doc. 31) and his Motion to Suppress Statements (Doc. 49). The Government contests these

19   motions. (Docs. 48, 56). Defendant replied to the Government's response on the motion to
20
     suppress statements. (Docs. 57). The Court held an evidentiary hearing on the motions on
21
22   August 10 and August 12, 2010. (Docs. 60, 61).

23          Based on the testimony presented at the evidentiary hearing the Magistrate Judge

24   recommends the District Court, after its independent review and analysis, DENY the above
25
     motions.
26

27   ─────────────────────

28          [1]This Report and Recommendation replaces in full the Report and Recommendation
     filed September 8, 2010. (Doc. 74). The Court notes no substantive changes were made.
     The corrections are related to citations and case law.

## I.    EVIDENTIARY HEARING

The Court held an evidentiary hearing on the Motion to Suppress Evidence (Doc. 31) and Motion to Suppress Statements (Doc. 49). Defendant argues that Border Patrol agents did not have reasonable suspicion to stop his vehicle. As to the issue of statements, Defendant argues he did not waive his *Miranda* rights before he made the statements. The Government contests the motion to suppress, arguing Border Patrol agents had reasonable suspicion to stop Defendant Milligan's vehicle. As to the statements issue, the Government contends Defendant was read his *Miranda* rights twice and both times Defendant indicated he understood his rights and was willing to talk. The Government further contends Defendant signed a written form of waiver, but concedes the form was lost.

At the evidentiary hearing, the Government produced the following witnesses to support its position:

1.    Jesse Adcock, U.S. Border Patrol Agent, supervisor of the sensor unit.

2.    Caitlin Werner, U.S. Border Patrol Agent employed by the Border Patrol since June 2008, and since that time assigned to Douglas Station, Arizona.

3.    Robert Colon, U.S. Border Patrol Agent, assigned to Douglas Station, Arizona since June 2006.

4.    William Silva, Task Force Officer ("TFO"), Drug Enforcement Administration, the case agent.

In support of his position, Defendant produced the following witnesses:

1.    Leo Duffner, private investigator hired by Defendant to investigate the area where the stop occurred and its vicinity.

2.    Defendant Michael Edward Milligan.

## II. FACTUAL FINDINGS

On May 31, 2009, Agent Werner was working at the Highway 80 checkpoint (Doc. 68, transcript from evidentiary hearing of August 10, 2010, pp. 14, 17 ("Doc. 68")), and Agent Colon was working as a roving patrol north of the Highway 80 checkpoint, around mile markers 310-311. (Doc. 71, transcript from evidentiary hearing of August 12, 2010, p. 45 ("Doc. 71")).[2]

The Highway 80 checkpoint ("Checkpoint") is located north of Tombstone on Highway 80, about a hundred yards north of the intersection of Highway 80 and 82. (Doc. 68, pp. 14, 17). The Checkpoint is located approximately 40 miles north of the U.S.-Mexican border. (Doc. 68, p. 67). This is the last Border Patrol checkpoint between the U.S.-Mexican border and Tucson, Arizona. (Doc. 71, p. 30). On re-direct, Agent Werner stated that the purpose of the Checkpoint is to apprehend terrorists, terrorist weapons, illegal aliens, and drugs that are being smuggled away from the border. (Doc. 71, p. 31). North of the Checkpoint, Highway 80 intersects with Spanish Bayonet Road. (*See* Government Exhibit 6 from evidentiary hearing held on August 10 and 12, 2010). Spanish Bayonet Road is an

---

[2]Agent Werner has worked for Border Patrol since January 2008. In June 2008 she was assigned primarily to Douglas Border Patrol Station and that remains her primary area to date. Her law enforcement training includes six month of training at the Federal Law Enforcement Training Center ("FLETC") and field training with a mentor when she arrived at the Douglas Station. (Doc. 68, p. 10). Agent Colon was hired by Border Patrol in June 2006 (Doc. 71, p. 41), and he received his federal law enforcement training in the U.S. Army and FLETC, which included an immigration law class, training in tracking and detecting drugs and aliens smuggling. (Doc. 71, pp. 42-43). Agent Colon also received three months field training with a mentor upon arriving at Douglas Station. (Doc. 71, p. 43). During field training, both agents learned about common routes of drugs and alien smuggling, how to respond to sensor activations and how to conduct checkpoint operations. (Doc. 71, p. 44; Doc. 68, p. 11).

unpaved road that has two perpendicular sections: one (approximately 0.3 mile long) going in North-South directions, and second, a shorter one (approximately 0.1 mile), going in the West-East directions. (Government Exhibit 6; Doc. 71, p. 110). Agent Werner described Spanish Bayonet Road as a "fairly common road used to circumvent the [C]heckpoint." (Doc. 68, p. 18). Agent Colon confirmed that fact and also testified that in his experience, two or three vehicle seizures out of approximately twenty in that area were on Spanish Bayonet Road. (Doc. 71, p. 73). In her two-year experience of working at Douglas Station, Agent Werner also stopped one car before this incident that used the same route to circumvent the Checkpoint and smuggle illegal aliens. (Doc. 68, p. 28). Leo Duffner, witness for the defense, also testified to Spanish Bayonet being known as commonly used by smugglers. (Doc. 71, p. 117).

On cross examination, Agent Werner testified that on May 31, 2009, at 8:19 p.m. the sensor on Spanish Bayonet Road was activated. (Doc. 68, p. 71). On direct, Agent Werner stated when she heard the radio dispatch regarding the sensor activation while she was at the Checkpoint, she turned around and started watching the road. At that moment Agent Werner saw headlights and taillights of two vehicles moving north on Spanish Bayonet, driving past the residences, and turning East on Spanish Bayonet towards Highway 80 north of the Checkpoint. (Doc. 68, pp. 20, 24, and 66). Agent Werner testified she found it suspicious that the vehicles were on Spanish Bayonet, which is not a well-traveled road, is hard to find especially at night or at dusk, and not used unless the vehicles were going to the few houses located on that road. (Doc. 68, p. 27). On direct, Agent Colon stated there are only four or five residences in that area. (Doc. 71, p. 48).

After making these observations, Agent Werner went to get a service vehicle and drove north of the Checkpoint and her partner contacted Agent Colon to check the vehicles out. (Doc. 68, p. 29). Agent Colon testified on direct that upon receiving the sensor activation information, he turned around and went up to the place where Spanish Bayonet exits onto Highway 80. He stationed there and waited for the vehicles to come out. (Doc. 71, p. 46). At 8:22 p.m.[3], another officer, Officer Pablo Lucero, transmitted on the radio that the vehicles seemed to drive in tandem. (Doc. 68, p. 34). Then, Agent Colon testified he saw two vehicles coming out of the Spanish Bayonet Road onto Highway 80 northbound. (Doc. 71, p. 47). On direct examination, Agent Colon described the driving behavior of these vehicles as follows:

> The first vehicle had made a pretty wide left turn, second vehicle turned on a shorter left turner, getting in front of the first vehicle; the first vehicle that made the left turn ended up being behind the – the secondary vehicle, and at that point they passed my location, heading northbound on Highway 80.

(Doc. 71, p. 47). Agent Colon admitted this seemed unusual to him. On direct examination, he testified he believed these two vehicles were together. (Doc. 71, p. 49). Agent Colon described his prior experience with tandem driving vehicles as follows:

> Normally one vehicle's the escort vehicle, the other vehicle is the load vehicle. And most of the time it's vehicles with out of state plates, rental vehicles, or [temporary] plates [...] that are coming across there. And if it's two vehicles, one out of state, one state, that indicates to us, through our training and experience, that the vehicle that's with the state plate is guiding

---

[3]Exact timing of events is taken from the radio transmissions disclosed by the Government at the evidentiary hearing (*See* Government Exhibit 10 from evidentiary hearing held on August 10 and 12, 2010).

the vehicle out of state, through the road, trying to bypass the checkpoint.

(Doc. 71, p. 49). Later in direct examination, Agent Colon indicated that the bait vehicle/load vehicle scenario was familiar to him, and stated:

> A bait vehicle is normally a [vehicle that] guides the load vehicle. And when they're getting to a certain point to where they know that they could get response from law enforcement, the bait vehicle gets behind the load vehicle to distract, starts driving erratically, slowing [down], speeding up, creating distance between the load vehicle and the law enforcement. So that way the load vehicle has a clear way out. Because obviously, the vehicle's going to be driving erratically and at high rate of [speed], and it'll take the – the visual of the load vehicle off the law enforcement's mind and [law enforcement] stick[s] to the guide vehicle, the bait vehicle.

(Doc. 71, p. 50).

Agent Werner testified based on her training that tandem driving (driving of two vehicles where one ("load vehicle") has the load in it and the other ("bait vehicle") shows the former where to go and serves as a distraction for law enforcement) is fairly common in drugs and aliens smuggling. (Doc. 68, p. 13). On cross, Agent Werner testified that overall the tandem driving lasted for approximately two miles and three minutes. (Doc. 68, p. 105).

Once the vehicles passed Agent Colon, he testified that he turned on his headlights and got behind the Cadillac. (Doc. 71, p. 50). At that point the Cadillac started swerving within the lane and into the oncoming traffic lane, braking rapidly, continuously, creating more distance between itself and the Cherokee. (Doc. 71, p. 51). Then it suddenly sped up, passed the Cherokee, and took off at a high rate of speed (approximately 95 mph), which Agent Colon reported on the service radio at 8:23 p.m. (Doc. 71, p. 51, 52; Doc. 68, pp. 37-

38).

On cross, Agent Werner testified it took her about a minute to get to the intersection of Highway 80 and Spanish Bayonet Road. (Doc. 68, p. 77). By that time, the vehicles were north of Agent Werner. (Doc. 68, p. 77). When the Cadillac sped off, Agent Colon reported on the service radio that he was following the Cadillac and Agent Werner responded she would follow the Cherokee. (Doc. 71, p. 51).

Passing by the Cherokee, Agent Colon testified he noticed Massachusetts license plates and reported that fact over the service radio. (Doc. 71, p. 51). At that moment, Agent Werner testified she was running a record checks on Defendant's license plates. (Doc. 68, p. 38). The records check returned the Cherokee registered in Massachusetts and Defendant Milligan as the registered owner. (Doc. 68, p. 39). On cross, Agent Werner stated the registration check returned that Defendant's vehicle was not stolen and was not in Mexico within the previous 72 hours. (Doc. 68, p. 100). On direct, Agent Werner testified the out-of-state license plates of Defendant's vehicle indicated to her that he would not be using the Spanish Bayonet Road for any lawful purpose. (Doc. 68, p. 39). She clarified during cross-examination that a significant number of vehicles do travel in that area with out-of-state license plates because of Tombstone touristic attractions. On the other hand, Agent Werner opined that most of them as a general matter come through the Checkpoint because they stay on Highway 80 (Doc. 68, p. 100), especially when it is dark. (Doc. 71, p. 40).

Agent Werner continued following Defendant's vehicle and noticed he reduced his speed from slightly above the speed limit to below the speed limit when she caught up to his vehicle. (Doc. 68, p. 40). Agent Werner testified Defendant started weaving within the lane

as if he was nervous or looking for somewhere to pull off and leave the vehicle. (Doc. 68, pp. 40-41). Agent Werner testified in her experience she had seen vehicles "swerve off the road and driver and occupants bail out because [they were] afraid of getting caught." (Doc. 68, p. 41). Leo Duffner, private investigator, testified that between the Checkpoint area and St. David, Highway 80 has a few speed reduction signs. (Doc. 71, p. 114). Defendant Milligan also testified there was a speed drop near St. David. (Doc. 71, p. 122).

On direct, Agent Werner testified she saw Agent Colon pulling over the Cadillac at a gas station, and shortly thereafter, north of Agent Colon she initiated the stop of the Cherokee by turning on the overhead flashing lights. (Doc. 68, p. 42). Agent Werner testified the stop occurred about mile marker 300, in the vicinity of St. David. (Doc. 68, p. 43). Agent Werner testified Defendant Milligan stopped immediately. Keeping her headlights on, Agent Werner testified that she got out of her vehicle, walked to the passenger side of Defendant's vehicle to be out of the lane of traffic and started talking to Defendant. (Doc. 68, p. 43).

Agent Werner testified she introduced herself as a Border Patrol Agent and asked Defendant what he was doing on Spanish Bayonet Road and asked for his identification documents. (Doc. 68, p. 43). While conversing with Defendant, Agent Werner testified she smelled the odor of marijuana through the open windows and saw bundles of something wrapped in contact paper on the back seat. (Doc. 68, p. 44). Agent Werner testified she was familiar with the smell of marijuana from her training and working experience and that this method of wrapping was commonly used to wrap marijuana bundles. (Doc. 68, p. 44). At this time, Agent Werner took out her service weapon and ordered Defendant out of the

vehicle. (Doc. 68, p. 45). She walked him around the front of the vehicle, kneeled him down, put handcuffs on him, frisk searched him for weapons and any other physical contraband, and placed him in her service vehicle. (Doc. 68, p. 45).

Meanwhile, Agent Colon followed the Cadillac to a gas station, talked to its driver, searched the Cadillac at the consent of the driver, and found an empty trunk with a strong smell of marijuana. (Doc. 71, p. 53-55). The Government acknowledged at the evidentiary hearing that nothing from this stop formed a basis for Agent Werner's reasonable suspicion to stop Defendant Milligan's vehicle, as Agent Werner had no knowledge about the specifics of Agent Colon's questioning the Cadillac driver. (Doc. 71, pp. 88-89).

Concerned for Agent Werner's safety and unable to contact her on the service radio, Agent Colon let the Cadillac go and drove back to the place where Agent Werner stopped Defendant's vehicle. (Doc. 71, p. 55).[4]

Ten or fifteen minutes after Agent Werner secured Defendant Milligan in her service vehicle, she testified Agent Colon arrived at the scene and he wanted to ask some questions, so she went back to her vehicle and read Defendant his *Miranda* rights from a Border Patrol card with Agent Colon being present. (Doc. 68, pp. 46-47). Agent Colon has no recollection as to whether he was present when Agent Werner read Defendant his *Miranda* rights, but he does remember he asked Defendant if he understood his rights, and Defendant said, "yes". (Doc. 71, pp. 57-58). Both Agent Werner and Agent Colon testified Defendant seemed to

---

[4]Agent Colon testified he could not reach Agent Werner, but he received a transmission from another agent, Diaz, who said, Agent Werner was at mile marker 300. (Doc. 71, p. 55).

understand his rights, he did not appear intoxicated or impaired in any way. (Doc. 68, pp. 49-50, 48; Doc. 71, pp. 60-61). On cross-examination, Agent Werner testified Defendant made an affirmative statement that he understood his rights and was willing to waive them. (Doc. 68, p. 110). Defendant Milligan admitted that Agent Werner in fact read him his *Miranda* rights when he was sitting in the backseat of Agent Werner's service vehicle (Doc. 71, p. 124), and that he stated he understood his rights (Doc. 71, p. 125). However, Defendant also testified Agent Werner *Mirandized* him while she was alone and that she started questioning him without any other agent, including Agent Colon, being present at the scene. (Doc. 71, p. 125). Conversely, Defendant testified he did not recollect seeing Agent Colon or being questioned by him at all before the Border Patrol Station. (Doc. 71, pp. 126-127).

There is some disagreement in the witnesses as to what questions Defendant was asked at this point and what answers he gave. Agent Werner testified Agent Colon asked Defendant whether he was following the Cadillac. (Doc. 68, p. 49). Agent Colon testified he asked Defendant who were the people in the Cadillac, and Defendant answered those were the people he was supposed to follow all the way to Interstate 10, and somebody else was going to pick Defendant up from there and transport him to Tucson. (Doc. 71, p. 56). Defendant testified the only question he was asked at the scene was about the contents of the vehicle, and he responded to Agent Werner he did not know and it did not belong to him. (Doc. 71, p. 125). At that point the agents stopped the questioning at the scene. (Doc. 71, p. 57).

After checking on Agent Werner's safety, Agent Colon testified he went back to the

place he stopped the Cadillac and further south, but the Cadillac was already gone. (Doc. 71, p. 58). Agent Colon testified he provided the information to the Intelligence Unit in Douglas Station, but to the best of his knowledge, the Cadillac was never found, and nobody from that Cadillac was ever arrested. (Doc. 71, p. 59). Not being able to locate the Cadillac, Agent Colon returned back to Agent Werner's location. (Doc. 71, p. 59).

Agent Werner testified it took approximately an hour to transport Defendant to the Douglas Station. (Doc. 68, p. 51-52).[5] When they arrived at the Border Patrol station, Defendant was taken out of the car, unhandcuffed, searched again, and placed in an isolation cell. (Doc. 68, p. 53). Agent Werner testified she and Agent Colon interviewed Defendant in one of the station's interview rooms. (Doc. 68, p. 55). Before the interview in the interview room, Agent Werner testified she read Defendant his *Miranda* rights again off of the service form I-214, which he read and signed. (Doc. 68, p. 53). Agent Colon testified Defendant was read his rights on the processing floor, but both agents stated that Defendant waived his rights and signed the waiver in the service form I-214. (Doc. 71, p. 62). On direct, Defendant testified Agent Werner and Agent Colon asked him if they could ask him some questions regarding the details of the incident, and Defendant said he would answer the questions. (Doc. 71, pp. 133-134). Defendant admitted that the agents "may have" read him his rights again, but he was absolutely certain he never signed any waiver forms. (Doc. 71, pp. 134, 140). The Government concedes the service form I-214 was lost during subsequent

---

[5]Agent Werner testified they spent about 20 minutes waiting for the tow truck, then went to the Checkpoint, and at 9:30 p.m. she and Defendant left the Checkpoint to go to the Douglas Station where they arrived approximately an hour later. (Doc. 68, p. 51-52).

processing and its current location is unknown.  (Doc. 56, p. 4, n. 3).

Within five to ten minutes after *Mirandizing* Defendant, the agents began the interview.  (Doc. 71, p. 62).  During the interview, the agents asked Defendant why he was following the Cadillac and how he got recruited into transporting marijuana.  (Doc. 68, p. 54).  They also asked him how much he was being paid, where he went to pick up the drugs, and where he was headed.  (Doc. 68, p. 56).  Agent Werner testified Defendant admitted he knew there was marijuana in his vehicle.  (Doc. 68, p. 56).  The interview took about fifteen minutes and took place within approximately an hour after Defendant and Agent Werner arrived at the Border Patrol station.  (Doc. 68, pp. 57-58).  Agent Werner testified at no point during the interview did Defendant indicate he wanted to remain silent or talk to an attorney.  (Doc. 68, p. 55).  Both Agent Werner and Agent Colon testified Defendant spoke and understood English well.  (Doc. 68, p. 58; Doc. 71, p. 65).  Agent Colon testified Defendant was not handcuffed, the agents had no weapons on them, Defendant seemed to be intelligent and answering the questions clearly.  (Doc. 71, pp. 64-65).

## III.  ANALYSIS

### A.  Reasonable Suspicion

The Fourth Amendment requires that, before officers conduct an investigatory stop of an individual, they must have reasonable suspicion the individual has committed or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 21-23 (1968), *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  To determine whether reasonable suspicion exists, reviewing courts must look at the totality of the circumstances and decide whether the agents or officers

had a "particularized and objective basis" for suspecting illegal activity. *Arvizu*, 534 U.S. at 273. The government official must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the government] intrusion." *Terry*, 392 U.S. at 21.

Officers are allowed to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (internal citations and quotation marks omitted). At the same time, such "experience may not be used to give the officers unbridled discretion in making a stop." *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir.2000) (*en banc*) (*quoting Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir.1986) (*overruled in part on other grounds, Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1045 (9th Cir.1999).

In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which a vehicle is encountered; (2) proximity to the border; (3) usual traffic patterns on the particular road; (3) previous experience with alien traffic; (4) recent illegal border crossings in the area; (5) erratic or evasive driving behavior; (6) aspects of the vehicle; and (7) the behavior or appearance of the driver. *United States v. Brignoni-Ponc*e, 422 U.S. 873, 884-85 (1975).

The Government here argues that several factors aroused the agents' reasonable suspicion that Defendant s vehicle was involved in criminal activity: (1) sensor activation on Spanish Bayonet Road; (2) Spanish Bayonet being known as a road commonly used by drugs

and aliens smugglers; (3) tandem driving of Defendant's Cherokee and the Cadillac and erratic driving of the latter; (4) Defendant's vehicle being an SUV with out-of-state license plates; and (5) Defendant's vehicle's weaving and slowing down when being followed by a Border Patrol vehicle.

We address each factor in turn, and then collectively.

### 1. Sensor Activation on Spanish Bayonet Road

Agent Werner testified there was a sensor activation on Spanish Bayonet Road. (Doc. 68, p. 71). This was a seismic sensor, detecting movement of vehicles only, located on Spanish Bayonet Road near where it intersects with Highway 82. (SEALED: Doc. 69, p. 7, 8). The location of the sensor is justified by the use of Spanish Bayonet Road in that area to circumvent the Checkpoint. As Agent Werner testified on direct examination, someone was driving east on Highway 82 toward Highway 80 would have to travel through the Checkpoint to travel north towards Tucson. (Doc. 68, p. 18). A person could avoid the Checkpoint if they used Spanish Bayonet Road. (Doc. 68, pp. 18-19).

The courts have long accepted alarms from seismic intrusion devices at the border as an acceptable factor in a reasonable suspicion analysis. *See, e.g.*, *United States v. Olafson*, 213 F.3d 435, 439-440 (9th Cir.2000); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1302 (9th Cir.1977).

The agents testified that right after the Spanish Bayonet Road seismic sensor activated, they saw the lights of two vehicles going north on Spanish Bayonet Road. (Doc. 68, p. 20). In the agents' experience, this indicated that two vehicles had just turned from Highway 82 to Spanish Bayonet Road, in circumvention of the Checkpoint. Since there were

- 14 -

no other vehicles in the vicinity, the agents reasonably deduced that the two vehicles that hit the sensor were the ones heading north on the Spanish Bayonet Road toward Highway 80. As Agent Werner correctly noted during the evidentiary hearing, hitting the sensor does not necessarily indicate the presence of smuggling activity. (Doc. 68, p. 104). However, it would reasonably raise interest in the vehicles that most likely tripped the sensor on a road known for circumventing the Checkpoint. The ensuing conduct of the vehicles including not stopping at the residences on Spanish Bayonet Road which would have indicated that they simply live there, and subsequent simultaneous turn in the northbound direction on Highway 80, created a particularized set of circumstances that formed reasonable suspicion.

### 2. Traveling on a Known Alien Smuggling Route

Officers' suspicion or awareness that a particular location or route is used predominantly for illegal purposes, including aliens or drugs smuggling, is strong support for a finding of reasonable suspicion. *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir.2006), *see also Arvizu*, 534 U.S. at 269, 277 (finding it significant that officers found the defendant on an unpaved road rarely traveled except for use by local ranchers and forest service personnel, but commonly used by smugglers to avoid a nearby border checkpoint). In contrast, a location or route frequented by illegal immigrants, but also by many legal residents, is not significantly probative to an assessment of reasonable suspicion. *See United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1124 (9th Cir.2002) (reasoning that the defendant's location on a highway commonly used for alien smuggling was of only "minimal significance" because the court presumed the great majority of people who used the highway were lawfully present in this country).

Here, both of the agents testified Spanish Bayonet Road was known as a road commonly used by drugs and alien smugglers. (Doc. 68, p. 18; Doc. 71, p. 73). Both agents had experience stopping smuggling vehicles on that road. (Doc. 71, p. 73; Doc. 68, p. 28). Even Defendant's witness, private investigator Leo Duffner, also testified to Spanish Bayonet being known as commonly used by smugglers. (Doc. 71, p. 117). Spanish Bayonet is a dirt road on the side of Highway 80, which has only a few houses on it. Agent Werner testified that she could surmise no legitimate reason why the vehicle would be on Spanish Bayonet Road, unless it was a vehicle of a resident of these few houses. The fact that the two vehicles observed by the agents came from the south and did not stop at the houses, but rather proceeded further to Highway 80, in the view of this Court substantially supports reasonable suspicion.

### 3. Tandem Driving

Based on radio transmissions received from other officers, Agent Werner decided that the two cars were traveling in tandem, and this circumstance added to her suspicion that criminal activity was afoot. The Ninth Circuit has recognized that traveling in tandem can be indicative of illegal smuggling activity. *United States v. Robert L.*, 874 F.2d 701, 704 (9th Cir.1989); *see also United States v. Larios-Montes*, 500 F.2d 941, 943-944 (9th Cir.1974) (driving in tandem, though not sufficient on its own to establish founded suspicion, is a factor that can be considered), *cert. denied*, 422 U.S. 1057 (1975); *Montero-Camargo*, 208 F.3d at 1139 (concluding that tandem driving could be given "some" weight in overall reasonable suspicion calculus).

However, it is the circumstances of the tandem driving that in the end determine

whether that factor is relevant. *Id.* Determination if the vehicles are driving in tandem must be based on more than "briefest of observations." *Robert L.*, 874 F.2d at 704 (following three vehicles for approximately one kilometer not strong indication of driving in tandem). Cases in which courts have found driving in tandem to be a factor supporting reasonable suspicion, the driving in tandem is significant and detailed. *See United States v. Medina-Gasca*, 739 F.2d 1451, 1453 (9th Cir.1984) (extended observation of three vehicles traveling close together, parking bumper-to-bumper, and later traveling once again in tandem).

In the case at issue, tandem driving of Defendant's vehicle and the Cadillac lasted approximately two miles, for approximately three minutes. (Doc. 68, p. 105). Thus, the agents observed the alleged tandem driving very briefly. Here, the agents did not notice anything in common between Defendant's car and the Cadillac, other than them driving in proximity to each other and turning north on Highway 80. On the other hand, Agent Colon's testimony as to the Cadillac's erratic driving behavior once the vehicles turned onto Highway 80 and supposedly noticed Agent Colon's service vehicle, and his elaborate description of a typical "lead car-load car" modus operandi could reasonably be expected to trigger the officers' suspicion. Standing alone, however, such suspicion is not sufficient to justify stopping either car. As the Ninth Circuit stated in its decision in *Larios-Montes*:

> It is not unusual for a driver on a lonely road at night, especially if he is unfamiliar with the road, to follow another car that is maintaining a steady pace. The movements of the car ahead, the flashing of its brake lights, its entering upon curves, etc., will give him warning of hazards of which he might otherwise be unaware.

500 F.2d at 943-944. However, in light of the sensor tripping in the area known to be used to circumvent the Checkpoint, the agents seeing two sets of headlights on Spanish Bayonet Road and the agents' credible testimony regarding "load" and "bait" vehicles, the Court finds the officers reasonably relied on this factor in their overall reasonable suspicion determination.

### 4. Defendant's Vehicle Being an SUV and its Out-of-State License Plates

The fact that the vehicle has characteristics common to those known to be employed in smuggling aliens and drugs is certainly relevant for the reasonable suspicion inquiry. *See Brignoni-Ponce,* 422 U.S. at 885. On cross examination, Agent Werner testified that in her experience, seventy percent of vehicles used to smuggle either aliens or drug loads are SUVs. (Doc. 71, p. 8). Since Defendant's vehicle was an SUV, Agent Werner indicated this was one of the factors that formed her reasonable suspicion that Defendant was involved in criminal activity. This corresponds to Agent Colon's testimony. He stated that although sedans are also used by drugs and alien smugglers, SUVs are significantly more common. (Doc. 71, p. 44).

As to out-of-state license plates, Agent Werner admitted that there were a lot of vehicles traveling in that area with out-of-state license plates because of Tombstone tourist attractions. However, in her opinion, most of them as a general matter stay on Highway 80 rather than drive on an unfamiliar side dirt road, especially when it is dark. (Doc. 68, p. 100; Doc. 71, p. 40). The fact that the vehicle with out-of-state license plates was driving on Spanish Bayonet Road and did not stop at any of the houses in that area, could raise reasonable suspicion that this vehicle was not coming from Tombstone or heading toward

the residences in that area, but rather that it was involved in criminal activity and the driver was attempting to avoid inspection at the Checkpoint.

Moreover, Agent Colon's description of a typical "load vehicle/bait vehicle" scenario also included the fact that often one of those vehicles has out-of-state license plates. (Doc. 71, p. 49). In his opinion, this indicated that the "state plate [vehicle] is guiding the vehicle out of state, through the road, trying to bypass the checkpoint." (Doc. 71, p. 49). However, Agent Werner did not testify that out-of-state plates were indicative of tandem driving to her. She only stated it was unusual to see a vehicle with out-of-state license plates on Spanish Bayonet Road. In this case, both the type of vehicle, an SUV, and out-of-state plates on an isolated road at night in tandem with another vehicle support a finding of reasonable suspicion.

### 5. The Weaving and Slowing Down of Defendant's Vehicle

Driving behavior can also be considered as a factor in the reasonable suspicion analysis. *See Brignoni-Ponce,* 422 U.S. at 885. Here, Agent Werner testified Defendant reduced his speed from slightly above the speed limit to below the speed limit when she caught up to his vehicle. (Doc. 68, p. 40). She also testified Defendant started weaving within the lane. (Doc. 68, p. 40). In Agent Werner's opinion, this indicated he was nervous or looking for somewhere to pull off and leave the vehicle. (Doc. 68, pp. 40-41). However, Leo Duffner, Defendant's private investigator, testified that between the Checkpoint area and St. David, Highway 80 has a few speed reduction signs. (Doc. 71, p. 114). Defendant Milligan also testified there was a speed drop near St. David. (Doc. 71, p. 122). In the view of this Court, the fact that Defendant reduced his speed may well indicate he was simply

complying with the speed limits that were located along Highway 80. Thus, such gradual slow down of Defendant's vehicle could not be considered in a reasonable suspicion analysis. Testimony regarding Defendant's weaving within the lane as if he was trying to pull over and escape was not convincing. Agent Werner testified Defendant's vehicle never left its lane, and when Agent Werner turned on her overhead lights, Defendant immediately stopped, which indicates he was not trying to flee. The Court finds the driving behavior of Defendant's vehicle is not a factor to justify reasonable suspicion.

Nevertheless, based on the totality of the circumstances, we conclude that the Border Patrol agents did have an objective and particularized suspicion that the two vehicles observed on Spanish Bayonet Road and Highway 80 were involved in criminal activity. First, the agents testified that a seismic intrusion device was activated, which in their experience indicated that someone had just turned from Highway 82 to Spanish Bayonet Road, a well-known route for circumventing the Checkpoint. Being able to deduce that the only two vehicles driving on Spanish Bayonet Road were the ones that tripped the sensor, the agents started observing the vehicles. The ensuing conduct of the vehicles, including not stopping at the residences in the area, and a simultaneous turn north on Highway 80, strengthened the agents' reasonable suspicion. Each circumstance acquires significance because of the presence of the other. Their combined weight is sufficient to constitute reasonable suspicion.

Thus, this Court finds the agents had reasonable suspicion that Defendant's vehicle was engaged in criminal activity, and the stop of his vehicle was justified. Therefore, the Magistrate Judge recommends that the evidence obtained as a result of the stop not be

suppressed.

**B.    Admissibility of Statements**

Defendant concedes Agent Werner read him his *Miranda* rights.  Defendant does not argue that he was coerced and the waiver was therefore involuntary.  Nor does he suggest that he lacked full knowledge and intelligence to properly waive his rights.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) (*Miranda* waiver valid only if voluntary, knowing and intelligent).  The only issue in this case is whether Defendant did in fact waive his *Miranda* rights before being questioned and providing inculpatory statements.  There is no testimony that Defendant was ever expressly asked if he wished to waive his rights.

"A valid waiver depends on the totality of the circumstances, where under the circumstances, defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it."  *United States v. Younger*, 398 F.3d 1179, 1185 (9th Cir.2005) (internal citation omitted).  A defendant's waiver of *Miranda* rights does not need to be express nor are police officers obligated to use a waiver form or ask explicitly whether a defendant intends to waiver his rights.  *Id*. at 1185 (internal citations omitted).

In the most recent case on *Miranda* waiver issue, the Supreme Court held that waiver "can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered."  *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2261 (2010).  The prosecution therefore does not need to show that a waiver of *Miranda* rights was express.  An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence.  *Id*. (internal citations and quotation marks omitted).   If the prosecution shows that a *Miranda*

warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. *Id.* at 2262.

Thus, in light of Defendant's admission that the rights were read to him at least before questioning, and that he understood his rights and agreed to talk to the agents, and since there is no evidence that Defendant's statements were coerced, the Court concludes the agents did not have to formally ask Defendant for a waiver of his rights. By stating that he would answer the questions, Defendant waived his right to remain silent. Agents testified he never asked for an attorney or said he was not going to talk without an attorney. Defendant did not rebut this testimony. Thus, the Court finds Defendant properly waived his *Miranda* rights and his statements made after that waiver are therefore admissible.

Defendant disputes signing a written waiver form, while Agents Colon and Werner claim he did. The Government cannot now produce the form, so this Court finds no written waiver form was signed. Nonetheless, as discussed above, this is not required for a valid waiver of *Miranda* rights.

At the evidentiary hearing, defense counsel argued Defendant did not make any incriminating statements when he admittedly was advised of his *Miranda* rights. (Doc. 71, p. 149). The Government's witnesses testify to the opposite, that Defendant admitted that there was marijuana in his vehicle and that he was supposed to follow the Cadillac until Interstate 10, where he was then supposed to be escorted by someone else to Tucson. (Doc. 68, p. 56; Doc. 71, p. 67). On this issue, it will be the jury's task to weigh the testimony of different witnesses and decide where the truth is. Resolving that conflict in testimony is irrelevant to the motions at issue.

## IV. RECOMMENDATION

For the reasons set out above, the Magistrate Judge recommends that the District Court, after its independent review, DENY Defendant's Motion to Suppress Evidence (Doc. 31) and his Motion to Suppress Statements (Doc. 49).

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CR 09-1230-TUC-CKJ**.

DATED this 9th day of September, 2010.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**